# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**REBECCA H. FINCANNON,**

          **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　　　　**Case No. 6:04-cv-1071-Orl-22DAB**

**BELLSOUTH CORPORATION,**

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 29)** |
| **FILED:** | **June 7, 2005** |
| **THEREON** it is **RECOMMENDED** that the motion be **DENIED**. | |
| **MOTION:** | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 30)** |
| **FILED:** | **June 8, 2005** |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. | |

Plaintiff Rebecca H. Fincannon filed suit against Defendant Bellsouth Corporation seeking to reinstate her disability benefits and pension[1]. The Defendant refused to reinstate Plaintiff's benefits, and she filed suit in this Court. The parties have filed cross-motions for summary judgment (Doc. Nos. 29, 30) and Responses (Doc. Nos. 33, 34, 39).

**Standard for Summary Judgment**

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. Pro. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

**Background Facts**

Plaintiff, Rebecca H. Fincannon, was employed by BellSouth Telecommunications, Inc., a subsidiary of BellSouth Corporation ("BellSouth") as a Service Representative with a net credited

---

[1] Under the terms of the Pension Plan, an individual automatically receives disability pension benefits (if they have 15 or more years of service, which Plaintiff did) when they are approved for long-term disability benefits. BSC 235 §4.03(a); Doc. No. 28 (Amor Dep.) at 42. Plaintiff was approved for Social Security Disability benefits. AR 260, 418. Under the LTD Plan, benefits received from Social Security and the Pension Plan are offset against the long-term disability benefit. BSC 38-39. Accordingly, in this case, Plaintiff's Social Security Disability benefit, when added to her pension disability benefit, completely offset all benefits payable under the LTD Plan and she actually received no money from that Plan. AR 421. Plaintiff was entitled to receive money from the Pension Plan as a disability pension for as long as she met the LTD Plan's definition of disability. BSC 235, 421.

service date of June 2, 1973[2]. BSC at 30-32. As an employee of BellSouth, she was a covered participant in the BellSouth Long Term Disability Plan for Non-Salaried Employees ("LTD Plan") as well as the BellSouth Pension Plan. AR 421-422; Amor Dep., Ex. B. The LTD Plan "is designed to provide protection against loss of earned income during periods of extended disability." Doc. No. 28 (LTD Plan) at 1. In order to become eligible for disability benefits under the LTD Plan, a participant must first have exhausted fifty-two weeks of benefits under the BellSouth Short Term Disability Plan. The LTD Plan defines a "disability" as:

> A physical or mental illness, whether work-related or non-work related, which makes a Participant who has been covered under the Short Term Disability Plan for 52 weeks unable to perform any type of work other than one which pays less than half of his base pay at the time his benefits under the Short Term Disability Plan begin. Effective January 1, 1993, for purposes of the definition of "Disability", a participant's earnings potential shall be determined using potential jobs in the community. The earnings test shall take into account a participant's functional capacities, background, (education, training, work experience) transferable skills, and the participant's age. The geographic area searched for jobs will be within a 35-mile radius of a participant's home address and/or within his prior work location.

Doc. No. 28 (LTD Plan) at 2.

Beginning on or about August 21, 1996, Plaintiff left work because of fibromyalgia, bursitis, tendonitis, carpal tunnel syndrome and depression; her benefits under the Short-Term Disability Plan began effective August 28, 1996. AR 17, 25-26, 32-33. Plaintiff was on and off short-term disability several times before exhausting the maximum of 52 weeks on February 7, 1999. AR 118, 125, 298, 309, 313, 321, 324, 334-36, 351.

---

[2] Plaintiff claims she was employed by BellSouth since June 21, 1971. BSC 30. The documents seem to support both dates. BSC 28-30. The exact date is not material to the issue of whether Plaintiff was entitled to LTD benefits; thus, the Court will use the later one as a more conservative estimate of Plaintiff's service with Defendant.

On November 7, 1998, Plaintiff submitted a claim for long-term disability benefits listing major depression, anxiety, fibromyalgia, chronic fatigue, insomnia, rheumatoid and degenerative arthritis. AR 261-71.  As part of her application, she also submitted an Attending Physician's Statement ("APS") and other reports from her treating psychologist, Alan D. Keck, Psy.D.  AR 272-77. She also submitted additional forms from Dr. Keck dated December 23, 1998 and January 12, 1999, on which he opined that Plaintiff was disabled. AR 129-33.  As part of her claim she also submitted an APS from her rheumatologist, Karamali Bandealy, M.D. who was treating her for fibromyalgia and related pain and fatigue. AR 281-282.  Dr. Bandealy noted that she was limited from performing "any significant strenuous or stressful activity" because of her pain and fatigue. *Id.*  In order to determine whether she qualified for long-term disability benefits, Broadspire sent her for an independent medical evaluation ("IME"). AR 106. The evaluation was performed by David J. Fleischmann, Ph.D., a licensed psychologist. AR 142-155. Dr. Fleischmann found that Plaintiff was disabled and that the combination of her depression, fibromyalgia and chronic fatigue were causing her disability. After reviewing the IME report, Broadspire determined that Plaintiff was disabled pursuant to the terms of the LTD Plan. AR 114. On February 5, 1999, Plaintiff was approved for LTD benefits and a disability pension. AR 421-24.

On February 3, 2000, Maribel Amor, a Claims Specialist II with Kemper, became involved in handling Plaintiff's disability case. Doc. No. 28 (Amor Dep.) at 31; AR 231-59. During 2000 and the first half of 2001, Ms. Amor received medical information from Plaintiff's health care providers, and Plaintiff continued to receive disability benefits. AR 231–41. On June 18, 2001, Amor requested updated medical information from Dr. Imbert, Plaintiff's treating psychiatrist, and Dr. Keck, Plaintiff's treating psychologist. AR 241. On July 18, 2001, Amor received a call from Dr. Keck

informing Ms. Amor that he had not seen Plaintiff in a while, and, therefore, there were no medical records that he could send. AR 243. On that same date, Ms. Amor sent a request for a Behavioral Health Clinician Statement or "BHCS" directly to Plaintiff. AR 241. Ms. Amor sent a second request for a Behavioral Health Form or "BHF" to Plaintiff on August 16, 2001, and second and third requests to Dr. Imbert, Plaintiff's treating psychiatrist, on September 14 and October 23, 2001. AR 243. On November 29, 2001, Ms. Amor called Plaintiff to inquire as to why forms had not been returned and left a detailed message. AR 245. On April 3, 2002, Ms. Amor reviewed the file and noted that all providers had been contacted and that an update was sent to Plaintiff, but she had not responded. AR 245.

Throughout the remainder of 2002, and into January 2003, Ms. Amor made repeated efforts to contact Plaintiff and was unsuccessful. AR 245–47. Broadspire sent Plaintiff certain requests dated October 4, 2002: a medical authorization, provider information form, and an LTD/Disability Pension Questionnaire. AR 504. Subsequent requests for this information were sent on November 7, 2002 and December 11, 2002. AR 507-09. On December 11, 2002, a "jeopardy" letter was sent to Plaintiff which quoted the LTD Plan: "Benefits shall not be paid for any period of Disability during which the employee is not under the care of a legally qualified physician . . ." and warned Plaintiff that her failure to comply "could place continuation of your benefits in jeopardy." AR 624-25.

On January 10, 2003, Ms. Amor's supervisor, Ruby Hotter, gave approval to terminate Plaintiff's LTD and Disability Pension, effective January 31, 2003, "related to non compliance in returning phone calls, responding to letters in addition to no responses received from known providers on case." AR 247; Amor Dep. at 35-39; AR 516-517 (letter dated January 10, 2003); AR 631-32. The letter also contained information regarding appeal rights.

On January 24, 2003, Ms. Amor received a request from Plaintiff to reinstate her benefits, noting that the reason Broadspire had been unable to contact her was that she had moved in with her mother. AR 519. In the letter, Plaintiff enclosed the LTD/Disability Pension Questionnaire and advised that she would have the appropriate forms completed by the psychologist at her next appointment. AR 519-22. Ms. Amor told Plaintiff that she did not have any medical information and could not reinstate Plaintiff's benefits. Plaintiff verified that she had not seen Dr. Keck and Dr. Imbert in about a year. AR 249. Based on Plaintiff's responses on the Questionnaire (AR 521), Broadspire sent requests to her treating physicians, Dr. Allen Taylor and Dr. Pamela Freeman for medical records and asked that they complete an APS. AR 249-251 and AR 526-527. Records were received from Drs. Taylor and Freeman on January 24, 2003. AR 538-43, 544-52.

On February 3, 2003, Ms. Amor notified Plaintiff that she needed to appeal her termination of benefits in writing. AR 253. On February 12, 2003, Ms. Amor contacted Plaintiff "to determine if she has appealed the termination of LTD/DP due to non-compliance." AR 253. Plaintiff then filed a written appeal dated February 14, 2003. AR 557-558. After the appeal was received, it was referred to Joyce Cote, to coordinate the appeal. AR 255.

While her appeal was pending, Plaintiff provided medical records from Dr. Freeman and Dr. Taylor. AR 575-89. Doc. No. 28 (Amor Dep.) at 49-50. On March 3, 2003, Broadspire received an APS from Plaintiff's psychologist, Dr. Keck noting that Plaintiff was unable to work because she could not perform the mental task of her occupation in a reliable and consistent manner. AR 255 (note dated March 3, 2003) and AR 570-572.

Ms. Amor forwarded all medical information received to the Appeals Coordinator, Joyce Cote. AR 257; Doc. No. 28 (Amor Dep.) at 51. Dr. Burstein, a clinical psychologist at Broadspire Services,

performed a peer review of the medical information provided by Dr. Keck. Doc. No. 28 (Amor Dep.) at 51-52; AR 257-58 (noted dated March 24, 2003); AR 644-645. Dr. Dennis Mazal performed a peer review with regard to other medical information. Doc. No. 28 (Amor Dep.) at 60-61.

At the end of March 2003, the "Appeal Committee" met and made a decision to uphold the termination of benefits[3]. AR 259 (note dated April 2, 2003). By letter dated April 3, 2003, Broadspire notified Plaintiff of the decision to uphold termination of her benefits. AR 598-99. The letter stated:

> The determination was based upon a lack of objective medical data from your physicians, Dr. Keck, Dr. Imbert, Dr. Freeman, Dr. Taylor, and Dr. Fleischmann. Information received effective 1998 through 2000 was not included in this review, as this time period was not indicative of medical treatment received during your denial period. The subsequent information you supplied, for your appeal, did not include supportive objective medical information, and therefore you are not considered to be totally disabled, as defined in the BellSouth Long Term Disability Plan. We did request two Kemper physicians review your file, and it was determined that the medical information presented for appeal did not support a disability.

AR 598–99.

The April 3, 2003 letter noted that Broadspire had found that Plaintiff, from a medical standpoint, had failed to submit information demonstrating that she was disabled pursuant to the terms of the Plan. AR 599  The April 3, 2003 letter did not allow her an opportunity to appeal the medical decision. AR 599. The April 3, 2003 letter indicated that the BellSouth Appeals Committee reviewed the claim on March 31, 2003. AR 598.

---

[3]Plaintiff takes issue with the date of the decision in the appeal decision letter and that there was no mention of March 26, 2003–the date the decision to uphold benefits was recorded by Joyce Cote. AR 259, 598. As Ms. Amor explained in her deposition, "It's customary for the doctors to call the examiners and sometimes advise them of their decision without, you know, or we can get the report back without the signature and maybe this is just an opinion. Maybe she had indication that, you know, the peer did not . . . support a disability from any occupation." Doc. No. 28 (Amor Dep.) at 62.

**ANALYSIS**

**Standard of Review for ERISA cases**

Plaintiff filed her Complaint for reinstatement of her disability benefits under the Employee Retirement Income Security Act ("ERISA"). The parties do not dispute that the Long-Term Disability Plan and the Pension Plan are employee welfare benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1001 *et seq.*

In *Buckley v. Metropolitan Life*, the Eleventh Circuit set forth three standards of review that a court may apply in reviewing a plan administrator's claims decisions: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests." 115 F.3d 936, 939 (11th Cir. 1997). When the plan documents explicitly grant the claims administrator the discretion to determine eligibility or construe the terms of the plan, the arbitrary and capricious standard is applied. *See Migliaro v. IBM Long-Term Disability Plan*, 231 F.Supp.2d 1167, 1177 (M.D. Fla. 2002) (citing *HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir. 2001)). The Eleventh Circuit has modified this arbitrary and capricious standard in cases in which the claims administrator was acting under a conflict of interest. *See Migliaro*, 231 F.Supp.2d at 1177 (citing *HCA*, 240 F.3d at 993). The modified standard is called the "heightened" arbitrary and capricious standard. *Migliaro*, 231 F.Supp.2d at 1177 (citing *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325-26 (11th Cir. 2001)). The heightened arbitrary and capricious standard of review for decisions by a conflicted ERISA fiduciary applies to both determinations of fact and to determinations of plan interpretation.  *Williams v. BellSouth*

*Telecommunications, Inc.*, 373 F.3d 1132, 1137 n.6 (11th Cir. 2004); *Torres v. Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir. 2003).

In *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), the Eleventh Circuit set forth the approach for use in judicially reviewing ERISA-plan benefit denials:

> (1)  Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2)  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3)  If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5)  If there is no conflict, then end the inquiry and affirm the decision.
> (6)  If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138.

Plaintiff contends that the *de novo* standard of review should apply in this case because the discretion for making final decisions on appeal was granted only to the BellSouth EBCRC and the final decision in Plaintiff's case was made by a Broadspire appeal committee or by Joyce Cote, a Broadspire employee. Defendant contends that the arbitrary and capricious – and not *de novo* – standard of review should apply because the Plan granted discretion to Broadspire through the EBCRC, and the appropriate Appeal Committee, not Joyce Cote who merely coordinated the appeal, made the final decision.

The Court need not decide which standard of review is applied if it determines that the claims administrator's decision was not "wrong." *See Williams*, 373 F.3d at 1138. An administrator's decision is deemed "wrong" when the court disagrees with the claims administrator's plan interpretation after a *de novo* review of the plan documents and disputed terms. *Id.*

Plaintiff contends Broadspire's decision to terminate Plaintiff's benefits was procedurally wrong because she was not given an additional appeal after submitting medical records. Defendant contends that the termination decision was not wrong because Broadspire terminated Plaintiff's LTD and disability pension benefits after Plaintiff failed to provide updated medical information for over one and one-half years (June 2001 to January 2003).

Plaintiff admits that she failed to provide information to Broadspire as requested prior to January 2003 and that benefits were terminated based on this admitted non-compliance. Doc. No. 29 at 16. Plaintiff contends that Broadspire failed to afford Plaintiff a full and fair review of the decision to terminate her benefits based on the medical evidence she submitted. Plaintiff contends that after she provided the information, the initial termination (based on non-compliance) should have been reversed and Broadspire should have started the review of her file from scratch, allowing her an additional appeal of the decision. She contends that Broadspire failed to provide her notice that her file was lacking "objective" medical information showing that she was disabled based on the peer reviews performed by Dr. Burnstein and Dr. Mazal, because those reviews were not done until after the initial denial for non-compliance.

BellSouth responds that Plaintiff was not entitled to copies of the peer reviews performed by Drs. Burstein and Mazal during the appeal process so that she could present new evidence to increase the likelihood of being determined "disabled" under the terms of the LTD plan. Doc. No. 33 at 4.

BellSouth points out that Plaintiff has provided no case authority to support her contention that she was entitled to a further review of the denial decision.

Plaintiff also contends that the decision to terminate her benefits was wrong on the merits because the medical records (after the initial denial) supplied showed that nothing had changed in Plaintiff's condition over the years. Plaintiff was originally determined to be disabled based on an independent medical exam by Dr. Fleischmann. AR 150-51. Dr. Keck, in his APS/BHCS dated February 26, 2003 opined that Plaintiff continued to be disabled. AR 601-02. Plaintiff contends that she remained disabled throughout the period and into the present for the same conditions for which she received benefits from 1997 until 2003 before the termination of benefits.

BellSouth argues that Plaintiff's noncompliance with the terms of the plan was considered during the appeal process when Broadspire reviewed the medical information from Plaintiff's providers and concluded that it did not support a finding that she was entitled to restoration of her benefits. BellSouth contends that "if [Plaintiff] suffered any detriment by the way her claim was handled, it was only because of her own failure to be under the regular care of treating physicians and to provide the plan administrator with medical information which supported her entitlement to ongoing benefits. . . . Although Plaintiff contends that she was entitled to a further review of the denial decision, she has provided no case authority to support her contention." Doc. No. 33 at 3-4.

**Review of Plaintiff's Claim**

The Court finds Broadspire's decision to terminate Plaintiff's benefits on January 11, 2003 was not procedurally "wrong," and Broadspire's decision once Plaintiff's medical records were received in January 2003 also was not "wrong." Broadspire terminated Plaintiff's eligibility for benefits because she was no longer considered disabled under § 9.3 of the LTD Plan, which states that

a participant will not be entitled to benefits if she fails to "cooperate in the processing" or "monitoring and evaluating" of her "medical condition during the continuation of such benefits." AR 516; Doc. No. 28 (Amor Dep.) at 37. Plaintiff does not dispute that she failed to provide information to Broadspire in a timely fashion. Doc. No. 29 at 16.

Broadspire made many attempts, over an eighteen month period, to contact Plaintiff by letter and telephone. Doc. No. 28 (Amor Dep.) at 67. As the termination letter details, Ms. Amor mailed forms to Plaintiff on April 2, October 4, and November 7, 2002, and tried to reach Plaintiff by phone on November 29, 2001, May 1, 2002, December 11, 2002 and January 9, 2003. AR 516a. On June 18, 2001, Ms. Amor also contacted Plaintiff's physicians – Dr. Imbert, Plaintiff's treating psychiatrist, and Dr. Keck, her treating psychologist – to request updated medical information. AR 241. When on July 18, 2001, Amor received a call from Dr. Keck informing Ms. Amor that he had not seen Plaintiff in a while and had no medical records to send, Ms. Amor sent the request for a Behavioral Health Clinician Statement directly to Plaintiff. AR 241, 243. On August 16, 2001, Ms. Amor sent a second request for a Behavioral Health Form to Plaintiff and second and third requests to Dr. Imbert, Plaintiff's treating psychiatrist, on September 14 and October 23, 2001. AR 243. On November 29, 2001, Ms. Amor called Plaintiff to inquire as to why forms had not been returned and left a detailed message. AR 245. Throughout the year 2002, and into January 2003, Ms. Amor made repeated efforts to contact Plaintiff and was unsuccessful. AR 245–47. Finally, on December 11, 2002, Ms. Amor sent a "jeopardy" letter to Plaintiff which warned Plaintiff that her failure to comply "could place continuation of [her] benefits in jeopardy." AR 624-25. Plaintiff still did not respond to Broadspire, though letters had not been returned by the post office. AR 247 (January 9, 2003 - "I have verified address and phone number with Mercer [pension administrator]; January 10, 2003 - "I called phone

number provided by Mercer."). On January 10, 2003, Ms. Amor sent Plaintiff a letter stating that her benefits were going to be terminated effective January 31, 2003. AR 516. Broadspire was not "wrong" to terminate Plaintiff's benefits based on her failure to cooperate in providing medical evidence that she remained disabled; Plaintiff does not seriously argue this point. The remaining issue is whether Plaintiff's appeal was "wrongly" decided.

The Court finds that Broadspire's decision on appeal to terminate Plaintiff's benefits also was not "wrong." On January 24, 2003, two weeks after Plaintiff was notified that her benefits were going to be terminated, she contacted Ms. Amor and requested reinstatement of her benefits. AR 249. Ms. Amor told Plaintiff that she could not "reinstate" her benefits without medical records. AR 249. Plaintiff told Ms. Amor that she had not seen Dr. Imbert, her treating psychiatrist, since October 2002 and she was taking Zoloft for the depression and "that seems to be working." AR 253 (February 3, 2003). Plaintiff also stated that she saw Dr. Taylor for depression and took Zoloft; she saw Dr. Freeman for all other diagnoses. AR 255 (February 26, 2003); AR 557. Plaintiff subsequently provided medical records from Dr. Keck (two page APS; AR 571-72), Dr. Freeman (four pages of treatment notes; AR 583-86), and Dr. Taylor (five pages of treatment notes; AR 577-81). Doc. No. 28 (Amor Dep.) at 49-50; AR 249-57 (documenting receipt of records).

Ms. Amor noted, according to Dr. Freeman's treatment notes, that the last time Dr. Freeman had seen Plaintiff was June 29, 2000 prior to the August 15, 2002 visit and that the physical exam was basically normal for the August and October 2002 visits. AR 257, 586. Ms. Amor informed Plaintiff that she "cannot reinstate benefits since claimant has been off medications and physical exams are basically normal." AR 257 (March 19, 2003). Plaintiff reported to Dr. Freeman that "she saw Dr.

Poiley[4] three or four times" and "she is doing well, and therefore did not come back for a visit." AR 586. Plaintiff also told Dr. Freeman she had not seen Dr. Imbert since January of 2002, and she was "off of all of her medications" and "no longer on her antidepressants." R. 586.

Broadspire received an APS on March 3, 2003 from Plaintiff's psychologist, Dr. Keck, opining that Plaintiff was unable to work because she could not perform the mental task of her occupation in a reliable and consistent manner. AR 255; AR 570-572. Plaintiff stated in her appeal letter dated February 14, 2003 that she had stopped seeing Dr. Keck "because she got so bad." AR 557. On the APS form, Dr. Keck indicated the date of last visit was the day he completed the APS, February 26, 2003; however there were no treatment notes or records (aside from the APS) of the visit from that day or from any prior visits for the relevant time period provided. AR 572. Eighteen months prior to that time, on July 18, 2001, Ms. Amor had received a call from Dr. Keck informing her that he had not seen Plaintiff in a while, and, therefore, there were no medical records that he could send. AR 243. Broadspire had a two page document completed by a psychologist who had not treated Plaintiff in two years, except to file out the APS form once Plaintiff's benefits had been terminated.

Ms. Amor forwarded all medical information to the Appeals Coordinator, Joyce Cote, around February 27, 2003. AR 257, 594; Doc. No. 28 (Amor Dep.) at 51. Ms. Cote then sent the information to be peer reviewed by a psychologist and a physician at Broadspire Services. Dr. Burstein, a clinical psychologist, performed a peer review of Dr. Keck's two page APS to determine if Plaintiff was unable to perform work from a psychological perspective. AR 645; Doc. No. 28 (Amor Dep.) at 51-52; AR 257-58. Dr. Burstein determined that Plaintiff's submissions "fail[ed] to support functional

---

[4]There were no records from Dr. Poiley pointed out by either party as part of the Administrative Record.

-14-

impairment(s) that preclud[e] work." AR 644. His report noted: "Medicals in file are from 1998>2000. . . .Was not tx for 1 year with any physician, including medical for other ailments." AR 644. Dr. Burstein opined:

> Dr. Keck, Ms. Fincannon's psychologist, expressed the opinion that Ms. Fincannon is unable to perform mental tasks in a reliable and consistent manner. However, aside from some problems with memory and the statement that Ms. Fincannon is easily confused, there were no indicators of impairments in functioning that would prevent Ms. Fincannon from performing work at all. While she is reported to have a sad and anxious affect, this would not appear to preclude her from performing work either. Although she is reported to have panic attacks, the frequency of twice per week for thirty minutes, would not preclude work. There were no indicators or changes in behavioral functioning. Ms. Fincannon is reported to be able to pay bills and she can drive. Therefore, while Ms. Fincannon might not be able to perform the core elements of her former occupation as a service representative, her abilities to write a sentence from dictation, follow a three-step command, perform basic mathematical operations, remember at least seven digits forward and five digits backwards, and her ability to apply attention and concentration for thirty to fifty minutes, does suggest the capacity to be able to perform some kind of work. She is also able to express her current circumstances appropriately and present with appropriate dress and hygiene. In order to substantiate that Ms. Fincannon is unable to perform work, from a psychological perspective, her providers would have to submit examination findings which document the presence of impairments. Examples of such findings would be behavioral observations, including the frequency, duration, and intensity of symptoms observed, the results of a formal mental status examination, or performance based tests of psychological functioning with standardized scores.

AR 645. Dr. Dennis Mazal performed a peer review with regard to other medical information and determined that the medical evidence failed to support functional impairments that preclude work. AR 640-41; Doc. No. 28 (Amor Dep.) at 60-61. Dr. Mazal noted that, although Plaintiff was described as having FMS trigger points, the number and severity of pain and range of motion were not described; he also pointed out that Plaintiff's continuing symptoms of FMS were less severe in regards to fatigue and generalized myalgias, and her bilateral shoulder impingement syndrome was gradually improved over time after local injection, and she had much less irritability than on the

previous visit, and better active motion in the shoulder. AR 640. Her left carpal tunnel syndrome improved with the use of wrist splints at bed time, there were no new major symptoms for other organ systems, and the physical exam was essentially normal. AR 640. No subsequent rheumatologic progress were submitted for his review and the last family practice office visit notes submitted for review were dated December 20, 2002; additional physical objective findings were unintelligible. AR 641.

Plaintiff contends that she was entitled to an additional appeal of Broadspire's decision based on medical records. The Court rejects this contention and finds that Broadspire's disposition of Plaintiff's appeal on the medical records was not "wrong." Broadspire's April 3, 2003 letter stated that the Committee sustained the Administrator's decision to deny LTD benefits based on a lack of objective medical data from Plaintiff's physicians to find her disabled. AR 598-99. The April 3 letter also stated:

> The subsequent information you supplied, for your appeal did not include supportive objective medical information, and therefore you are not considered to be totally disabled, as defined in the BellSouth Long Term Disability Plan. We did request two Kemper physicians review your file, and it was determined that the medical information presented for appeal did not support a disability. Please be advised that there is only one appeal level under the BellSouth Disability Plan.

AR 599.

Plaintiff failed to provide her medical records for more than eighteen months. Once she did, the sparse medical records or information obtained from Plaintiff's letters or conversations with Ms. Amor showed that Plaintiff had not been receiving mental health treatment for the two-year period under consideration and her physical examinations were basically normal. The Court find that Broadspire's decision on the appeal is not "wrong." Moreover, Broadspire was not wrong to allow

-16-

one appeal from its January 10, 2003 decision. Plaintiff was allowed to submit all of the medical records that she desired during the 60 day appeal period, and she did.

Plaintiff argues that she was denied the opportunity to respond to Dr. Burstein's notation of the inadequacy of the information to substantiate that she is unable to perform work from a psychological perspective. Doc. No. 29 at 16. Dr. Burstein pointed out the lack of examination findings which document the presence of impairments, such as a behavioral observations, symptoms observed, and a formal mental status examination. AR 645. The information Plaintiff did provide shows that she did not have any of this evidence -- she admitted that she had stopped seeing Drs. Imbert and Keck. The only record of a visit to Dr. Keck was in February 2003 (during the appeal process), for him to fill out the APS, apparently based on his knowledge of Plaintiff's condition from 2001 when he had not seen her in awhile. Moreover, Plaintiff told Ms. Amor that she was taking Zoloft for the depression (prescribed by Dr. Taylor her primary care physician) and "that seems to be working." AR 253. Plaintiff's failure to proffer any additional information that would change this analysis moots any issue that might be raised as to the efficacy of a further appeal.

Plaintiff also contends that the decision was wrong because Broadspire failed to conduct a complete vocational assessment, functional capacity evaluation, or labor market survey of Plaintiff before terminating her benefits. Plaintiff also argues that a vocational assessment was necessary to determine what the compensation level would be if she could perform some sort of work and whether such jobs were in the "35-mile radius" of her home address or work location. BellSouth contends that a vocational assessment of Plaintiff was unnecessary because there was no medical evidence of that her mental condition (history of depression), and her physical condition (history of fibromyalgia and arthritis) kept her from working at her former position. The Court agrees. Because the Court finds

that Broadspire's decision was not wrong on Plaintiff's physical condition, the Court need not reach the issue of Plaintiff's vocational qualifications. Plaintiff was capable of performing her former job as a Service Representative, and it was not necessary to perform a vocational assessment to determine whether she could earn fifty percent of the wages of her former occupation.

The analysis and conclusions herein pretermit any need to consider the procedural aspects of Plaintiff's claims and for determination of the ultimate standard of review.

It is therefore recommended that Defendant's motion for summary judgment be granted (and Plaintiff's motion be denied) and that the Clerk be directed to enter a final judgment in favor of Defendant, dismissing Plaintiff's claims.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on November 29, 2005.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy